# SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This action is currently pending in U.S. District Court Case Number 6:16-CV-01998-MC ("Action"). The parties to this Action are Plaintiff Michalle Wright ("Plaintiff"), represented by Edward Reeves, Kennon Scott, Samantha Sondag, Mathew dos Santos, and Kelly Simon, and Defendants Darci Jo Jennings, Garth Gulick, Colette Peters, Steve Shelton, Lori Riha VanCleave, Jana Russell ("Defendants"), represented by James S. Smith, Andrew Hallman, and Shannon Vincent ("Parties"). In this Action, Plaintiff alleged violations of her civil rights by Defendants stemming from an alleged lack of medical and mental health care for her Gender Dysphoria, and alleged resulting physical and emotional harm. Plaintiff sought compensatory damages. The Defendants denied Plaintiff's allegations. The parties proceeded to a judicial settlement conference, facilitated by Judge John Acosta. The Parties agreed to settle this Action for the consideration set forth in this Settlement Agreement and Release of Claims ("Agreement") on the following terms:

**A.** **Effective Date:** The effective date of this Agreement is October 18, 2017.

**B.** **Plaintiff's Release of Claims:** In consideration for the settlement payment and the non-economic relief discussed below, Plaintiff, individually and on behalf of any heirs, executors, administrators, successors, agents, and assigns agrees to release, acquit, and forever discharge Defendants and all those in interest with them, including the State of Oregon and all of its political subdivisions, agencies, departments, administrators, officers, current and former employees, agents, attorneys, and insurers (collectively "Released Parties"), from any and all claims, demands, or causes of action, whether known or unknown, under any legal, equitable, or other theory, that exist or may exist against the Released Parties through the Effective Date of this Agreement.

The release, acquittal, and discharge described above ("Release") includes any claims against the Released Parties – including the Oregon Department of Justice and Risk Management – arising from the negotiation or execution of this Agreement. This Release also includes any

Page 1 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

94104311.8 0099820-01025

Exhibit 1 to Notice of Settlement, Page 1 of 12

damages (including past and future medical and mental health expenses, lost wages, impairment of earnings, emotional distress, pain and suffering, punitive damages, and any other compensatory, economic, noneconomic, nominal, or other forms of damage) and equitable relief (including injunctions or declaratory judgments) and including any and all expenses (attorney fees, costs, and disbursements).

Nothing in this Release shall restrict Plaintiff's ability to bring a claim for damages against any of the released parties with respect to any act or omission occurring after the Effective Date of this Agreement, including a claim for any alleged breach of this Agreement. Nothing in this release shall restrict Plaintiff from bringing an action for equitable relief to enforce this Agreement pursuant to Paragraph E of this Agreement.

**C.     Settlement Payment:** As consideration for Plaintiff's Release of Claims, and on behalf of the Released Parties described above, the State of Oregon, by and through the Oregon Department of Administrative Services/Risk Management ("Risk Management"), shall pay Plaintiff the sum of One Hundred Sixty-Seven Thousand Five Hundred Dollars ($167,500), plus attorney's fees and costs totaling One Hundred Thousand Dollars ($100,000) ("settlement payment").

**D.     Other Relief:** As consideration for Plaintiff's Release of Claims, and on behalf of the Released Parties described above, the State of Oregon, by and through the Oregon Department of Corrections ("ODOC"), shall provide Plaintiff with the following other relief:

   **1.     Forgiveness of Debt.** ODOC will forgive the following debts incurred by Plaintiff: (1) a $276.20 copy advance; (2) disciplinary fines of $353.53; (3) a $4220.10 medical advance; (4) a $411.35 medical advance; and (5) a $6.65 postage advance.

   **2.     Plaintiff's Housing:** The parties agree to the following with respect to Plaintiff's current and future housing:

   a)     Plaintiff is currently incarcerated at the Oregon State Correctional Institution ("OSCI"). On August 8, 2017, ODOC's Transgender and Intersex Committee ("TAIC") reviewed Plaintiff's request for a transfer to the Coffee

Creek Correctional Facility ("CCCF") pursuant to OAR 291-210-0050. The TAIC declined Plaintiff's request.

      **b)** Based on the independent review of the TAIC, ODOC's current plan is to keep Plaintiff at OSCI until the TAIC approves her for a transfer to CCCF where she would remain until her release. Plaintiff will remain at OSCI or CCCF until her release unless she must be transferred to another facility due to her medical or mental health needs, a transfer is necessitated due to her behavior (including placement in special housing at another facility), or if she develops a conflict and must be transferred away from her conflict.

      **c)** ODOC will transfer Plaintiff to CCCF if approved by the TAIC pursuant to OAR 291-210-0050. Plaintiff will be reviewed again by the TAIC on November 7, 2017, and every two months thereafter until transferred to CCCF. The TAIC has exclusive authority to determine if and when Plaintiff is transferred; however, that decision will be based on legitimate, documented security and health concerns and not considerations over Plaintiff's biological sex or the presence of genitalia.

    **3.** **Medical Care for Plaintiff's Gender Dysphoria:** ODOC agrees that gender dysphoria is a serious medical condition and it will continue to provide Plaintiff with medically necessary treatment for that condition. That treatment includes, but is not necessarily limited to, the following:

      **a)** ODOC will continue to consult with an outside medical consultant to determine the appropriate and medically necessary care and treatment for Plaintiff's gender dysphoria.

      **b)** ODOC is providing Plaintiff with hormone therapy and will continue to provide that treatment so long as it is recommended by her medical providers and continues to be part of her treatment plan. That includes periodic

Page 3 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

monitoring of Plaintiff's hormone levels by her primary care physician. ODOC's current case plan is to monitor plaintiff's hormone levels monthly through 2017, or until her hormone levels are within an acceptable range for a transgender woman. Future monitoring will be determined by her primary care physician in consultation with the consultant.

      c)    ODOC will continue to review Plaintiff's medical and mental health care as part of the Gender Non-conforming Therapeutic Levels of Care committee ("GNC-TLC"). This has and will continue to include consideration of any of Plaintiffs' requests for surgical intervention. In addition, ODOC agrees that at the GNC-TLC in January, 2018, once Plaintiff has been on hormones for a year, the GNC-TLC will consider whether to refer Plaintiff to a mental health professional for an evaluation of Plaintiff's requests for surgical intervention (e.g. consider a referral for surgery).

    4.    **Mental Health Care for Plaintiff's Gender Dysphoria:** ODOC will continue to provide Plaintiff with gender specific therapy for her Gender Dysphoria. Gender specific therapy includes, but is not necessarily limited to, time with a Qualified Mental Health Provider ("QMHP") who is qualified to provide gender specific therapy set aside regularly to address her gender dysphoria, to address specific coping mechanisms for her dysphoria and distress, and to assist her with moving forward in her transition. ODOC will also continue to provide training to QMHPs to ensure that they are qualified to provide gender specific therapy in a respectful, inclusive manner. ODOC will ensure that Plaintiff's QMHP is current and will stay current with ODOC's and other training in this area.

    5.    **Transgender Support Group:** ODOC will promptly and in good-faith consider any formal proposal for a support group that would benefit Transgender inmates (or LGTBQ inmates generally) if one is made by an outside entity or individual. ODOC

will base its decision on whether to allow such a group based on the following factors: The qualifications of the volunteers, protecting medical privacy of inmates, ensuring the safety of any inmate choosing to participate, and ensuring that no single institution houses all transgender inmates because of the presence of a group.

6.  **Feminizing Canteen, Grooming, and Apparel:**

    a)  **Canteen:** ODOC will continue to review and update its list of all-institution canteen to ensure that inmates in all facilities have access to all canteen items available on the CCCF canteen that do not pose a risk to the safety and security of the institutions. This will be done through the current security review process. ODOC specially acknowledges Plaintiff's request to make curling irons and flat irons available in-cell or to be checked out. ODOC is considering that request and, on or before November 2, 2017, ODOC will notify Plaintiff of whether and how it is going to make available any canteen items not currently available to Plaintiff, including but not limited to curling irons and flat irons, while Plaintiff is in general population.

    b)  **Grooming:** ODOC will provide Plaintiff an electric razor (or allow her to use her own) without restriction as to where on her body she can use it, regardless of whether she is housed in special housing or general population.

    c)  **Apparel:** Regardless of where plaintiff is housed, ODOC will provide her plaintiff clothing appropriate for her size (as determined by ODOC) and bras (both support and sports) and underwear.

7.  **Staff Directives Regarding Transgender Inmates:** ODOC has provided and will continue to provide the directives to staff listed in Attachment 1 to this Agreement. This has been and will continue to be done through written directives and was made part of ODOC's 2017 annual in-service training. Staff who fail to comply with these directives with respect to Plaintiff shall be subject to verbal counseling or

progressive discipline. The failure of a single individual staff member to comply with these directives with respect to Plaintiff shall not be considered a breach of this Agreement. However, the failure of ODOC management to address, through verbal counseling or progressive discipline, any staff members' repeated failure to comply with these directives with respect to Plaintiff may be considered a breach.

      **8.    Medical Rules and/or Protocols for Gender Dysphoria:** ODOC will continue to work on a rules and/or protocols that address the medical needs of inmates with gender dysphoria. This includes, but is not limited to, rules and/or protocols for providing hormone therapy and for considering surgical intervention. ODOC will provide the American Civil Liberties Union ("ACLU") and Basic Rights Oregon ("BRO") with a draft of these rules and/or protocols on or before January 15, 2018. If the ACLU or BRO have issues or objections to the form or content of these rules and/or protocols, then ODOC will engage in meaningful conferral with the ACLU and/or BRO in good faith to resolve those issues or objections (including in person conferral, if requested). ODOC will not finalize or submit for public comment any rules and/or protocols before that conferral. ODOC has exclusive authority to determine the final version of these rules and/or protocols.

      **E.    Enforcement and Continuing Jurisdiction:** The parties agree that Plaintiff retains standing to seek enforcement of the terms of this Agreement while Plaintiff remains in ODOC custody prior to her release. The parties further agree that Judge Acosta shall retain continuing jurisdiction to enforce the terms of this Agreement, and that Plaintiff may seek enforcement of this Agreement without filing a separate action.

No person or entity not a Party to this proceeding shall have any rights to enforce this Agreement or intervene in a proceeding seeking enforcement of the Agreement. This Agreement does not impair or limit any non-parties' rights to pursue any and all relief from the released parties relating to the subject matter of this proceeding, or with respect to any other claims, but

Page 6 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

nothing in this Agreement shall limit or estop the released parties from asserting any claims or defenses in any separate proceeding.

  **F.**  **Newly-Discovered Evidence:** The Parties agree that if, after the Effective Date of this Agreement, they discover evidence different from or in addition to the evidence which they now know of or possess, this Agreement remains in full force and effect.

  **G.**  **Plaintiff is Responsible for all Subrogation and Liens:** Plaintiff acknowledges that all subrogation and lien claims arising out of contract or under state or federal law-including, but not limited to, subrogation or lien claims of or related to health care providers, insurance carriers (including personal injury protection), workers' compensation carriers, attorneys, and any federal or state agency or programs such as Medicare, Medicaid, or Social Security-are the sole and separate obligation of Plaintiff which Plaintiff agrees to pay or otherwise resolve. Plaintiff will defend, indemnify and hold harmless the Released Parties from and against all such lien and subrogation claims brought against the Released Parties.

  **H.**  **Medicare Disclaimer and Waiver:** By signing below, Plaintiff declares under penalty of perjury that: (1) Plaintiff is not currently entitled to Medicare; and (2) none of the treatment received for the injury or injuries claimed in this Action (or related to the incident giving rise to this Action) or released in this Agreement were submitted to or paid for by Medicare. Plaintiff waives, releases, and forever discharges Released Parties from any obligations for any claim or future claim, known or unknown, arising out of the failure of Released Parties to provide for a primary payment or appropriate reimbursement to Medicare pursuant to 42 U.S.C. § 1395y(b)(3)(A), and Plaintiff shall defend, indemnify and hold harmless the Released Parties for any claims arising out of arising out of 42 U.S.C. § 1395y(b). Plaintiff further understands this settlement may impact, limit or preclude Plaintiff's right or ability to receive future Medicare benefits arising out of the injuries alleged in this lawsuit.

  **I.**  **No Tax Representations:** No party warrants or represents how the United States Internal Revenue Service ("IRS"), the Oregon Department of Revenue, or other governmental

authority will treat the settlement payment for tax purposes, and agree that no further payment of money from Released Parties will be due in the event that the payments or the release of the claims embodied in this Agreement or any portion thereof is found by the IRS, the Oregon Department of Revenue, or other governmental authority to be, or result in, taxable income to any party. The Released Parties, as part of their reporting requirements, may have to communicate with the IRS, including submitting IRS form 1099. The Released Parties reserve the right to respond to inquiries by said authorities and to make any additional disclosures requested by the governmental authority or as required by law. Plaintiff is solely responsible for the tax consequences of settlement payment, and Plaintiff agrees not to hold the Released Parties responsible for taxes due.

  **J.**  **Entire Agreement:** This Agreement contains and constitutes the entire agreement and understanding of the Parties, notwithstanding any and all prior negotiations, discussions, undertakings or agreements made in arriving at this Agreement. There are no representations, agreements, or inducements between the Parties except as set forth expressly and specifically in this Agreement. Any benefits provided to or accommodations reached with the Parties during the negotiation of this Agreement that are not described in this Agreement were made solely in the discretion of the Parties and are not part of the consideration for or the terms of this Agreement.

  **K.**  **No Admission of Fault or Future Precedent:** The Parties agree that this Agreement is not to be construed as an admission or proof of any liability or fault whatsoever on the part of the Released Parties. This Agreement does not establish a precedent in the settlement of any current or future grievance, claim of unfair labor practice, or other dispute among the Parties, and shall not be admissible as evidence in any future arbitration, administrative or court proceeding except in a proceeding brought to enforce the terms of this Agreement. In the event Plaintiff pursues a claim waived or released pursuant to this Agreement, the Released Parties may plead this Agreement as an absolute defense.

L.   **Waiver of Cost of Care:** ODOC waives the right to recover any proceeds from the settlement payment as "cost of care" pursuant to ORS 179.620(1). In no way do any of the released parties admit liability, nor have they been found liable through adjudication, as referenced in ORS 179.620(5)(a). On the contrary, the released parties expressly deny all liability of any type.

M.   **No Waiver:** The failure by any of the Parties to enforce at any time, or for any period of time, any one or more of the terms or conditions of this Agreement or a course of dealing between the Parties, shall not be a waiver of such terms or conditions or of such Party's right to enforce each and every term and condition of this Agreement.

N.   **Invalidity:** This Agreement does not waive any right that may not legally be waived. If any provision contained in this Agreement shall for any reason be held to be invalid, illegal, void, or unenforceable in any respect, such provision shall be deemed modified so as to constitute a provision conforming as nearly as possible to such invalid, illegal, void, or unenforceable provision while still remaining valid and enforceable, and the remaining terms or provisions of this Agreement shall not be affected.

O.   **Binding Agreement and Ownership of Claims:** This Agreement shall be binding upon the Parties, and their heirs, representatives, executors, administrators, successors in interest, insurers and assigns. The Parties acknowledge that they have not transferred or assigned, or purported to transfer or assign, to any person or entity, any claim, or any portion of interest of any claim, that was or could have been raised in this Action.

P.   **Acknowledgment of the Terms of the Agreement:** By the signatures below, the Parties acknowledge that they have read and know the contents of this Agreement, that they fully understands the Agreement's terms, and that they enter the Agreement voluntarily for the purpose of making a full compromise and settlement. Each of the Parties further represents it has consulted or has had the opportunity to consult with legal counsel of its choice concerning the legal effect of this Agreement before signing it, and that each party executes this Agreement

voluntarily. Further, the persons executing and delivering the Agreement represent and warrant that they are fully authorized to do so, and that the execution of delivery of the Agreement is lawful and voluntary.

      Q.      **Judgment of Dismissal with Prejudice:** The Parties agree to a dismissal of the pending Action with prejudice, without costs or fees to either party. Counsel for Defendants shall file a Stipulation of Dismissal after counsel for Plaintiff acknowledge receipt of monetary amounts contained in section "Settlement Payment" above, without fees or costs to either party, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii). Additionally, counsel for the Defendants shall file a Notice of Settlement with a copy of this Agreement attached pursuant to ORS 17.095. The Parties agree to execute these documents and any further documents and take any further actions, as may be reasonable and necessary, in order to carry out the purpose and intent of this Agreement.

      R.      **Counterparts:** This Agreement may be executed in counterparts, including counterparts received by facsimile or electronic transmission, with each counterpart constituting an original. The executing Parties agree that a photocopy or other signed copy of this Agreement is as effective as the original.

IT IS SO AGREED TO BY THE PARTIES:

_____    DATED this 16th day of October, 2017.
MICHALLE WRIGHT
Plaintiff

_____    DATED this 20 day of October, 2017.
SHELLY HOFFMAN
Oregon Department of Administrative Services

_____    DATED this 20th day of October, 2017.

Page 10 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

94104311.8 0099820-01025

Exhibit 1 to Notice of Settlement, Page 10 of 12

**HEIDI STEWARD**
Oregon Department of Corrections

**APPROVED AS TO FORM:**

_____          DATED this /9th day of October, 2017.
**EDWARD REEVES**, OSB #83304
Attorney for Plaintiff


_____          DATED this /9 day of October, 2017.
**JAMES S. SMITH**, OSB #840932
Senior Assistant Attorney General
Attorney for Defendant State of Oregon

Page 11 - SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

94104311.8 0099820-01025

Exhibit 1 to Notice of Settlement, Page 11 of 12

# ATTACHMENT 1

ODOC is committed to treating Transgender inmates in a respectful, inclusive manner.

All ODOC inmates, regardless of their biological sex, are permitted to express their gender identity through grooming, pronoun use, and dress so long as that expression is consistent with ODOC's rules and policies and does not draw undue attention on the inmate.

An inmate does not draw undue attention on themselves just by expressing a gender identity inconsistent with their biological sex. Rather, an inmate draws undue attention on themselves when the inmate's actions could compromise the safety and security of the inmate or the institution.

Staff should refer to inmates by their preferred pronoun *or* to address them as "Inmate Doe" or "Adult in Custody (AIC) Doe." Staff should not purposefully use an incorrect pronoun. Staff should never make discriminatory comments and take punitive actions for any inmate's gender-based activities (*e.g.* a biologically male inmate who wears make-up should not be harassed or disciplined for that choice) or because of staff's personal views or beliefs regarding Transgender persons.